UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

Orlando Division

Case Number:

LYNNE M. GIBSON, Ph.D.,
f/k/a Lynne M. Gleiber,

     Plaintiff,

vs.

JETBLUE AIRWAYS CORP.,

     Defendant.

_____/

## <u>Complaint for Damages and Injunctive Relief — Jury Trial Demanded</u>

### Count I — Age Discrimination Under the ADEA

Plaintiff, Lynne M. Gibson, Ph.D., f/k/a Lynne M. Gleiber, sues

defendant, JetBlue Airways Corp., and as grounds shows:

### <u>Introduction</u>

1.     This is an age- and race-discrimination action brought pursuant

to the Age Discrimination in Employment Act, 29 U.S.C. § 621, <u>et seq</u>.

("ADEA"), Florida Civil Rights Act, §§ 760.01, <u>et seq</u>., FLA. STAT. ("FCRA"),

42 U.S.C. §§ 1981 and 1988(b), by Lynne M. Gibson, Ph.D., a 52-year-old,

African-American senior analyst whom JetBlue:



**One**, hired as a supervisor, but never permitted her to supervise the substantially younger, all-white stable of analysts working at its training center, JetBlue University, in Orlando;

**Two**, gave assignments with vague instructions, missing data and inappropriate analytical tools, and then complained about the results—which, despite the disadvantages, were exactly what she had been asked to produce;

**Three**, subjected to a hostile-environment by such things as threatening to fire her if she would not resign; not allowing her to work from home as it did younger, white analysts; giving her make-work assignments, and demanding that she turn in work-in-progress which her supervisor could then criticize as incomplete, and

**Four**, firing her and replacing her with a substantially younger white woman.

Dr. Gibson seeks all the relief available under the Age Discrimination in Employment Act, 42 U.S.C. § 1981 and the Florida Civil Rights Act of 1992, including attorney's fees and litigation expenses.

### Jurisdiction, Parties, Venue

2.     This court has jurisdiction pursuant 28 U.S.C. §§ 1331 (federal question).  The court has supplemental jurisdiction to determine the state claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in the Middle District of Florida pursuant to 28

U.S.C. § 1391(b) because the claims arose there and the defendant is subject to personal jurisdiction there.

4.     At all material times, plaintiff Lynne M. Gibson, Ph.D., was protected by the ADEA, and the FCRA because she was over forty years of age.  She was an "employee" as contemplated by the ADEA and by the FCRA.  She is protected from racial discrimination in employment by 42 U.S.C. § 1981.

5.     At all times material, defendant JetBlue Airways Corp. ("JetBlue") was:

a.     an "employer" as contemplated by both the ADEA and FCRA, and

b.     a party with whom Dr. Gibson enjoyed contractual rights, as contemplated by § 1981.

### Satisfaction of Conditions Precedent

6.     Dr. Gibson, on or about November 13, 2015, filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to the ADEA, which also satisfied the filing requirements and perfected his rights under the FCRA:  the charge alleged that Therese Schmidt, the manager of Assessment, Measurement & Evaluation ("AME") for JetBlue in Orlando told Dr. Gibson October 23, 2015 that she wanted Dr. Gibson to resign and that Dr. Gibson did not do so, JetBlue would fire

her—which it did January 26, 2016, of which Dr. Gibson informed the EEOC investigator handling her case.

7.      The EEOC issued Dr. Gibson a Notice of Right to Sue July 16, 2018, within 90 days of which Dr. Gibson is filing suit.

8.      The Florida Commission on Human Relations ("FCHR") deferred its handling of the case to the EEOC without either conciliating or making a finding adverse to Dr. Gibson within 180 days of the filing of the Charge of Discrimination, which failure to act satisfies Dr. Gibson's exhaustion-of-administrative-remedies requirement and entitles her to maintain a civil action.

## General Allegations

9.      JetBlue hired Dr. Gibson on or about June 24, 2015 as a Senior Analyst, Assessment and Evaluation to work on the Assessment, Measurement, & Evaluation ("AME") team at JetBlue University, the company's training facility in Orlando, Florida.

10.     Dr. Gibson demonstrated her qualifications for the job:

a.      through a series of interviews culminating in an in-person interview with Therese Schmidt, the 30-something AME manager, and Jennifer Carlson, the 28-year-old Supervisor of Learning Analytics, during which she successfully completed an assessment in which she was required to demonstrate both:

        i.     advanced analytic skills using data presented in Excel and analyzed using the Statistical Package for the Social Sciences (SPSS), and

        ii.    knowledge of advanced analytics and teaching abilities that encouraged student engagement;

     b.    by a history of having published as a political scientist work  based on advanced analytic abilities, i.e., Surges and Declines in United States Social Policy; An analysis of support for social policy bills in the U.S. House of Representatives from 1972-2002, ISBN: 978-3-639-21442-Q, and

     c.    by having previously used her advanced Excel skills to create for a prior employer, Tulane University, a calculation/learning tool, i.e., a Federal work-study calculator, that remains in use today.

11.    During Dr. Gibson's initial 90 days of JetBlue employment, she was assigned to (and completed without any articulated dissatisfaction with her performance):

     a.    the leadership and planning for the JetBlue Insight Network ("JIN");

     b.    planning the monthly JIN conference calls amongst analysts and senior analysts that included presentations by one of the participants;

     c.    bringing an intern on board and supervising her, and

d.      writing content for the AME Certification program and delivering one of the course offerings.

12.      Those assignments were consistent with what Ms. Schmidt told Dr. Gibson during her orientation, i.e., that Dr. Gibson would not be doing any analyses herself, but rather would be supervising three analysts on the team—even though Dr. Gibson was never assigned to supervise anyone.

13.      The only flaw in Dr. Gibson's evaluation discussed at her 90-day evaluation September 22 was the omission of two attendees' names on the list for the JIN Summit.

14.      Although JetBlue stated in a position statement to the EEOC that:

a.      "As a Senior Analyst on the AME team, [Dr.] Gibson was responsible for reviewing and analyzing performance metrics, reporting on such data and making recommendations based on trends identified in the data";

b.      "[Dr.] Gibson's performance problems became apparent shortly after she commenced employment," and

c.      "Generally, Ms. Schmidt observed that [Dr.] Gibson was not demonstrating the type of advanced analytical and critical thinking skills which a Senior Analyst should possess,"

Dr. Gibson had not been assigned any such tasks prior to the October 2, 2015 meeting.

15.     Nonetheless, a community-service project that Dr. Gibson had begun working on between late August and early September was taken away from her and assigned to a 26-year-old analyst, Lauren Kramer.

16.     JetBlue's position statement also accused Dr. Gibson of turning in sloppy work product on or about October 20, i.e., a "Key Driver Analysis Assignment Summary and Review" that JetBlue characterized as "plainly unacceptable" as a result of Dr. Gibson's "fail[ure] to follow Ms. Schmidt's specific instructions," having engaged in "analyses [that] were incomplete and/or flawed," and exhibiting "a significant lack of attention to detail," and betraying that Dr. Gibson "appeared to lack advanced data visualization skills and a lack of knowledge of Microsoft Excel."

17.     The assignment was given solely to Dr. Gibson, even though Ms. Schmidt had Dr. Gibson meet with Ms. Carlson about doing the project together.

18.     Dr. Gibson, who had been told that she would be supervising analyses, not performing them, later learned Ms. Schmidt gave her the assignment not so much as a job to be done, but rather as a test of Dr. Gibson's data analysis skills, which had already been tested during her pre-hiring interview.

19.     The assignment was to "conduct one JBU analysis by [close of business October 19]," concerning which Ms. Schmidt elaborated:

For this analysis (which we'll finalize in the meeting today), I'd like to see the following:

- An executive summary report that utilizes the template found here:

  https://sites.JetBlue.com/sites/jbu/LTSTeam/AME/Shared%20Documents/Customers/Projects/DataintoActionProcess/ContextDriven Analysis_Ternplate.docx

- A more detailed report that describes your analyses in detail. You can format that however you'd like, but it should include your research question(s), rationale for statistical test(s) chosen, details about any assumptions made and your rationale for making them, results, and implications

- Create at least one of the included charts in Excel

Please let me know if you have any questions.

20.     JetBlue's representation to the EEOC ignores:

        a.     An acknowledgment by Robin King, the Regional Manager of Crew Relations, i.e., human resources, that she had reviewed Ms. Schmidt's instructions and found them lacking;

        b.     Dr. Gibson's having told Ms. Schmidt prior to doing the analysis what kind of methodology she would using for the assignment;

        c.     Dr. Gibson's having provided Ms. Schmidt with not only the Excel chart that she requested, but two;

        d.     Ms. Schmidt's having said "no" during the planning meeting at which Dr. Gibson asked her if there was anything in particular that she wanted included in the initial analysis—but criticizing Dr. Gibson for not including a separate follow-up on individual instructors;

e.    Dr. Gibson's having timely delivered an analysis that addressed each issue that Ms. Schmidt included in her instructions;

f.    Ms. Schmidt's not having told Dr. Gibson that she would need student grade sheets to meaningfully interpret the data, about which Dr. Gibson learned from a flight instructor and obtained the grade sheets through a co-worker, and

g.    Ms. Schmidt's having given Dr. Gibson a Statistical Package for the Social Sciences (SPSS) to use in performing the analysis that lacked the logistic regression command that Dr. Gibson needed to produce the key driver analysis that Ms. Schmidt complained after the fact that Dr. Gibson had not provided—of the absence of which logistic regression command:

i.    Ms. Schmidt was ignorant when she handed Dr. Gibson the assignment and the SPSS computer package with which to perform it, or

ii.    Ms. Schmidt was aware of, but gave Dr. Gibson a tool to accomplish something that that tool would not produce.

21.    A few days later, Dr. Gibson learned that Ms. King had surveyed the junior analysts in the department, gathering from them what she said was a unanimous opinion that Dr. Gibson's Excel skills were not up to par— even through Excel research techniques is a component of an undergraduate

Quantitative-Research Methods course that Dr. Gibson had taught for more than three years as an adjunct professor at the University of Central Florida.

22.    Ms. Schmidt then assigned Dr. Gibson to compile a report on Flight Standards/Safety/Training Leadership, giving her only survey results and the names and job titles of the persons involved but withholding from her:

    a.    how the managers who had requested the report intended to use it;

    b.    critical data contained in an earlier report, and

    c.    subject-matter knowledge about flight-deck practices, e.g., whether reading through a pre-takeoff check list or reciting it from memory is appropriate, and forbade Dr. Gibson to question anyone who might have needed answers because the project was confidential.

23.    During the October 23 meeting between Ms. Schmidt and Dr. Gibson, Ms. Schmidt told Dr. Gibson that she wanted her to resign—and when Dr. Gibson said that she would not resign, Ms. Schmidt told her that she would be fired.

24.    Shortly thereafter, at a meeting that included Ms. King, Ms. Schmidt denied the firing threat:  "Those words never came out of my mouth."

25.    During the meeting with Ms. Schmidt and Ms. King, Dr. Gibson began hyperventilating; Ms. King called Dr. Gibson's husband to come pick

her up and said that she had been prepared to call paramedics if could not come.

26.    Ms. Schmidt on October 30 issued a "final guidance" notice, the penultimate progressive-discipline step at JetBlue, even though Dr. Gibson had not received any earlier guidances.

27.    As Dr. Gibson was working on that project November 4, she overheard a Ms. Carlson, the supervisor, assigning a similar-sounding task to the 26-year-old Ms. Cramer, whose response was:  "I'll do it.  I'll do it.  And she can get fired."

28.    Dr. Gibson's overhearing of the conversation triggered an anxiety attack so severe that she was taken to an emergency room and hospitalized for five days, following which she took sick leave until December 2.

29.    Prior to that, in addition to subjecting Dr. Gibson to such stress that Dr. Gibson had to go to Employee Assistance, Ms. Schmidt refused Dr. Gibson the opportunity to work from home one day a week—which the younger analysts were all permitted to do.

30.    Upon Dr. Gibson's return to work, Ms. Schmidt asked her to do a report comparing crew member surveys from two different airports, but gave her reports that (as had been the case in flight-safety project) differed from the embedded data in the surveys.

31.     As Dr. Gibson attempted to trouble-shoot the situation to reconcile the data, Ms. Schmidt demanded that Dr. Gibson simply forward her work product as is—and then criticized her for its being incomplete.

32.     Dr. Gibson's final assignment was a jargon-laden request by Jeff Kruse, the JetBlue's Director of Inflight and System Operations Training, to develop a system for "flagging" students prior to their failing various tests mandated by the Federal Aviation Administration ("FAA")—a request to "show me what success looks like" that was complicated by, among other things the reality that the FAA, not JetBlue, sets the required scores.

33.     The quoted criticisms of Dr. Gibson's analysis for Mr. Kruse did not evidence a simple subjective disagreement between Mr. Kruse, Aleli Anderson (one of Mr. Kruse subordinate) and Ms. Schmidt on one side, and Dr. Gibson on the other, but factual mischaracterizations:

        a.      rather than there being "a rather large disconnect between Jeff's initial request and what was actually delivered," as expressed by Ms. Anderson (after the fact, but not when she previewed the final product immediately before its presentation), a comparison of Mr. Kruse's initial request, Dr. Gibson's notes from speaking with his team members, and the analysis that was delivered reveals that Mr. Kruse got exactly what he asked for;

b.      any deficiencies in the use of data for the analysis was caused by Mr. Kruse's failure to provide it, e.g., scores of all of the students who had taken the tests that were being analyzed, and

c.      the characterization of the use of "standard deviation" to analyze test scores as "rather rudimentary" is one that can be articulated only by  someone with either absolutely no knowledge of the technique or with an intent to mislead.

34.     Although JetBlue told the EEOC that Dr. Gibson was terminated because her "job performance was objectively inferior to every other person on her team," substantially younger analysts (all of whom were white and 30 or younger) have demonstrated serious failings, but with lack of any consequence, e.g.:

a.      Curran Merrigan:

i.      failed (along with Jessica Thompson) to respond to a request for data by the College of Airports;

ii.      submitted a report that was invalid because he used a linear regression analysis, when what was required was categorical regression;

iii.      had the responsibility during a workshop of demonstrating a Chi-square analysis—but could not do so;

b.      Ms. Kramer:

i.      had failed to deliver a report to Grayson Cash in the College of Flight;

ii.      was unable to explain to an AME workshop in November one of the most crucial element of a "t test," i.e., the standard error, which Dr. Gibson then explained.

iii.      attempted, unsuccessfully, to jump in when Mr. Merrigan was unable to demonstrate the Chi-square analysis;

c.      Ms. Thompson, during the same AME certification meeting at which Ms. Kramer was unable to explain "standard error" and both Mr. Merrigan and Ms. Kramer were unable to explain a Chi-square analysis, demonstrated an ignorance of the most critical aspects of correlation analysis, stating that the correlation coefficient did not convey directionality because "you can't tell which of the two variable is doing what"—which is nonsense, since directionality is a function of the correlation coefficient having a positive or negative value.

35.      Following Dr. Gibson's termination, she was replaced by Ms. Kramer.

36.      JetBlue's treating Dr. Gibson less favorably than it did the substantially younger, white analysts and replacing her with Ms. Kramer, raises an inference of unlawful age and race discrimination.

37.      Dr. Gibson's age was the reason that prompted JetBlue to:

a.      not allow her to perform the supervisory duties for which she was hired;

b.      set her up for failure by assigning her analyses to do, but not giving her either correct data or the appropriate statistical tools to accomplish the mission;

c.      demand that she hand in unfinished work and then criticize her for its incompleteness;

d.      threaten her with termination;

e.      solicit appraisals of her skills from the junior personnel she had been hired to supervise, and

f.      terminate her.

38.      JetBlue's actions, more particularly alleged above, constituted violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq., and were done willfully with knowing and or reckless disregard of the ADEA's proscriptions.

39.      As a direct, natural, proximate and foreseeable result of JetBlue's actions, Dr. Gibson has lost wages and benefits in the past and will suffer additional losses in the future.

40.      JetBlue's treatment of Dr. Gibson constituted a wilful violation of the ADEA, entitling Dr. Gibson to recover liquidated damages.

41.      Dr. Gibson is entitled to be awarded reasonable attorney's fees and litigation expenses pursuant to 29 U.S.C. § 626(b).

WHEREFORE, plaintiff, Lynne M. Gibson, Ph.D., prays that this Court will:

a.    issue a judgment that the discrimination against Dr. Gibson by JetBlue was a violation of Dr. Gibson's rights against age discrimination under the ADEA;

b.    enjoin JetBlue from continuing to violate the Dr. Gibson's federally protected rights and to make Dr. Gibson whole through back pay and reinstatement or, if that is not feasible as a make-whole remedy, an award of front pay;

c.    grant Dr. Gibson judgment against JetBlue for back wages and liquidated damages for the violations of the ADEA;

d.    grant Dr. Gibson her reasonable attorneys' fees and litigation expenses against JetBlue; and

e.    provide any other relief that is appropriate.

### Count II—Tangible-Detriment Age Discrimination Under the FCRA

42.    Dr. Gibson realleges and incorporates in Count II the matters set forth in ¶¶ 1-4, 5(a), 6, 8, 9-36 and 37(f).

43.    JetBlue's actions as more particularly alleged above, constituted tangible-detriment age discrimination, i.e., not allowing Dr. Gibson to do the job for which she was hired and then firing her, in violation of § 760.10(1), FLA. STAT.

44.     As the direct, proximate and foreseeable result of JetBlue's actions, Dr. Gibson has lost wages and benefits in the past and will suffer additional losses in the future and has suffered mental anguish, loss of dignity, a diminution of her reputation and other intangible injuries for which she is entitled to compensatory damages.

45.     The actions of JetBlue and its managing agents constituted a wilful and wanton violation of Dr. Gibson's statutory rights against age-discrimination, entitling her to punitive damages.

46.     Dr. Gibson is entitled to be awarded reasonable attorneys' fees and litigation expenses pursuant to § 760.11(5), FLA. STAT.

WHEREFORE, plaintiff, Lynne M. Gibson, Ph.D., prays that this Court will:

a.     issue a judgment that the discrimination against Dr. Gibson by JetBlue was a violation of Dr. Gibson's rights against age discrimination under the FCRA;

b.     enjoin JetBlue from continuing to violate the Dr. Gibson's statutorily protected rights and to make Dr. Gibson whole through back pay and reinstatement or, if that is not feasible as a make-whole remedy, award Dr. Gibson front pay;

c.     grant Dr. Gibson judgment against JetBlue for back pay, compensatory damages and punitive damages;

d.      grant Dr. Gibson her reasonable attorneys' fees and litigation expenses against JetBlue; and

e.      provide any other relief that is appropriate.

**Count III—Hostile-Environment Age Discrimination Under the FCRA**

47.      Dr. Gibson realleges and incorporates in Count III the matters set forth in ¶¶ 1-4, 5(a), 6, 8, 9, 15, 18-33 and 37.

48.      JetBlue's actions as more particularly alleged in ¶¶ 15 and 18-33 above, constituted hostile-environment age discrimination in violation of § 760.10(1), FLA. STAT.

49.      As the direct, proximate and foreseeable result of JetBlue's actions, has suffered mental anguish, loss of dignity, a diminution of her reputation and other intangible injuries for which she is entitled to compensatory damages.

50.      The actions of JetBlue and its managing agents constituted a wilful and wanton violation of Dr. Gibson's statutory rights against age-discrimination, entitling her to punitive damages.

51.      Dr. Gibson is entitled to be awarded reasonable attorneys' fees and litigation expenses pursuant to § 760.11(5), FLA. STAT.

WHEREFORE, plaintiff, Lynne M. Gibson, Ph.D., prays that this Court will:

a.      issue a judgment that the discrimination against Dr. Gibson by JetBlue was a violation of Dr. Gibson's rights against age discrimination under the FCRA;

b.      enjoin JetBlue from continuing to violate the Dr. Gibson's statutorily protected rights;

c.      grant Dr. Gibson judgment against JetBlue for back pay (for her leave of absence), compensatory damages and punitive damages;

d.      grant Dr. Gibson her reasonable attorneys' fees and litigation expenses against JetBlue; and

e.      provide any other relief that is appropriate.

## Count IV:  42 U.S.C. § 1981 Tangible-Detriment Race Discrimination

52.     Plaintiff realleges and incorporates the allegations of ¶¶ 1-4, 5(b) and 9-37, as if fully set forth in this count.

53.     Dr. Gibson's race was a substantial or motivating factors in the decisions to treat Dr. Gibson as Jet Blue did and to eventually terminate her.

54.     The actions of JetBlue as alleged above had the purpose and effect of denying Dr. Gibson the same right to make and enforce contracts as is enjoyed by white citizens, in violation of Dr. Gibson's rights under 42 U.S.C. § 1981.

55.     The actions of JetBlue in treating Dr. Gibson as it did and terminating her as alleged in ¶ 37(f) were intentionally and purposefully done to Dr. Gibson because of her race.

56.     As a direct, natural, proximate and foreseeable result of JetBlue's actions, Dr. Gibson has suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

57.     The actions of JetBlue exhibited oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for plaintiff's civil rights so as to entitle Dr. Gibson to an award of punitive damages against JetBLue to punish it for its conduct and to deter it and others like it from such conduct in the future.

58.     Dr. Gibson is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988.

59.     Dr. Gibson, having been discriminated against by JetBlue has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

60.     The discriminatory actions of JetBLue towards Dr. Gibson, in which actions higher management participated, of which actions higher management was aware and which higher management ratified, were in such reckless disregard of Dr. Gibson's statutory rights against discrimination as to entitle her to an award of punitive damages.

WHEREFORE, plaintiff, Lynne M. Gibson, Ph.D., prays that this Court will:

a.     Issue a judgment that the discrimination against plaintiff by defendant was a violation of her rights under 42 U.S.C. § 1981;

b.     Enjoin defendant to make plaintiff whole through reinstatement or, if that is not feasible as a make-whole remedy, to award plaintiff front pay;

c.     Grant plaintiff judgment against defendant, including punitive damages;

d.     Grant plaintiff his reasonable attorneys' fees and litigation expenses against defendant; and

e.     Provide any other relief that is appropriate.

### Count V:  42 U.S.C. § 1981 Hostile-Environment Race Discrimination

61.     Plaintiff realleges and incorporates the allegations of ¶¶ 1-4, 5(b) and 9, 15, 18-33 and 37(a)-(e), as if fully set forth in this count.

62.     Dr. Gibson's race was a substantial or motivating factors in the decisions to treat Dr. Gibson as Jet Blue did and to eventually terminate her.

63.     The actions of JetBlue as alleged above had the purpose and effect of denying Dr. Gibson the same right to make and enforce contracts as is enjoyed by white citizens, in violation of Dr. Gibson's rights under 42 U.S.C. § 1981.

64.     The actions of JetBlue in treating Dr. Gibson as it did and terminating her as alleged in ¶ 37(f) were intentionally and purposefully done to Dr. Gibson because of her race.

65.   As a direct, natural, proximate and foreseeable result of JetBlue's actions, Dr. Gibson has suffered past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

66.   The actions of JetBlue exhibited oppression, malice, gross negligence, willful or wanton misconduct, or a reckless disregard for plaintiff's civil rights so as to entitle Dr. Gibson to an award of punitive damages against JetBLue to punish it for its conduct and to deter it and others like it from such conduct in the future.

67.   Dr. Gibson is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988.

68.   Dr. Gibson, having been discriminated against by JetBlue has suffered irreparable harm for which there is no plain, adequate or complete remedy at law.

69.   The discriminatory actions of JetBLue towards Dr. Gibson, in which actions higher management participated, of which actions higher management was aware and which higher management ratified, were in such reckless disregard of Dr. Gibson's statutory rights against discrimination as to entitle her to an award of punitive damages.

WHEREFORE, plaintiff, Lynne M. Gibson, Ph.D., prays that this Court will:

a.      Issue a judgment that the discrimination against plaintiff by defendant was a violation of her rights under 42 U.S.C. § 1981;

b.      Enjoin defendant to make plaintiff whole through reinstatement or, if that is not feasible as a make-whole remedy, to award plaintiff front pay;

c.      Grant plaintiff judgment against defendant, including punitive damages;

d.      Grant plaintiff his reasonable attorneys' fees and litigation expenses against defendant; and

e.      Provide any other relief that is appropriate.

## Demand for Jury Trial

Dr. Gibson demands trial by jury on all issues so triable.

Respectfully submitted,

s/ *William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.:  470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.:  275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

**Attorneys for the Plaintiff,**
**Lynne M. Gibson**

\\amlong3\cpshare\CPWin\HISTORY\180912_0001\16DD.1A